UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BRANDON LEE STANLEY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>Defendants. | Case No. C15-256RSL<br><br>FINDINGS OF FACT &<br>CONCLUSIONS OF LAW |

This matter was heard by the Court in a two-day bench trial commencing on September 11, 2023. Plaintiff Brandon Lee Stanley filed this lawsuit alleging negligence on the part of employees of the United States in obtaining and providing rehabilitative services for Stanley following a fracture in his right hand.

**I.     Evidence Presented at Trial**

**A. Background**

The following facts are undisputed, *see* Dkt. # 101; Dkt. # 102:

On Saturday April 6, 2013, Mr. Stanley fell while in custody at the Federal Detention Center ("FDC") SeaTac and injured his hand. A Bureau of Prisons ("BOP") nurse practitioner, Dean Pedersen, evaluated Stanley in the prison housing unit shortly after his fall and ordered x-rays of Stanley's right hand. On Monday, April 8, 2013, Stanley received an x-ray of his hand and was provisionally diagnosed with a fracture in his right thumb. On April 23, 2013, Stanley was seen by a non-BOP orthopedic surgeon, Dr. Vincent Muoneke, who diagnosed Stanley with a Rolando-type fracture of his right thumb. On April 25, 2013, Dr. Muoneke performed surgery on Stanley to repair the fracture of his right thumb. On June 12, 2013, Dr. Muoneke performed

FINDINGS OF FACT & CONCLUSIONS OF LAW - 1

surgery on Stanley to remove pins that had been placed during the April 25, 2013 procedure. On July 2, 2013, a Bureau of Prisons physician, Dr. Maria Dy, removed stitches from Stanley's hand and placed a consult request for physical therapy.

On July 11, 2013, the FDC SeaTac's Utilization Review Committee ("URC") considered and approved the request for Stanley to receive physical therapy, determining that he would receive physical therapy from a non-BOP provider after a one to three month waiting period. Ex. 30 at 72.

On September 10, 2013, Stanley had his first physical therapy session with Advance Physical Therapy in Burien, Washington. At this initial appointment, his physical therapist recommended that he be seen for 1-2 visit(s) per week for up to 4-6 weeks. His therapist also provided him with information on at-home exercises he could do between visits.

Stanley attended four additional physical therapy sessions on October 1, October 10, October 15, and October 21, 2013. Later that month, Stanley was transferred from FDC SeaTac to Federal Correctional Institution ("FCI") Sheridan in Oregon. He did not receive any additional physical therapy after his transfer to Sheridan. Stanley testified that he did not request any additional physical therapy until he was transferred to FCI Lompoc, a BOP facility in California, in 2016. Dkt. # 109 at 49.

**B. Scheduling Responsibilities**

At trial, two FDC SeaTac employees – Andrea Hagberg and Dean Pedersen – testified as to the scheduling process for inmates' medical appointments.

Mr. Pederson explained that the physician or physicians employed by the detention center are "responsible for the clinical operations of the detention center" and that in 2013, the physicians were Dr. Dy and Dr. Souza. Dkt. # 109 at 78-79. Responsibility for "clinical operations" includes signing off on postoperative care, such as physical therapy. *Id.* at 79. When asked who "controls" the scheduling of medical appointments for inmates, Pedersen testified that "to the best of [his] knowledge, that's partly determined by the Marshals' ability to take someone somewhere, our scheduler or medical assistant's ability to get an appointment, and the

FINDINGS OF FACT & CONCLUSIONS OF LAW - 2

URC committee's decision as to how urgent that is," further noting that "some of that stuff requires regional approval." *Id.* at 80.

Pedersen testified that the URC "determines who goes out for procedures, more extensive examinations outside of the detention center." *Id.* He stated that "[t]o the best of [his] knowledge," the URC is usually comprised of the "person that does the scheduling, our administrative assistant," "one of the physicians, if we have more than one; the healthcare administrator; often an associate warden; and often someone from the counseling department." *Id.* at 81. He further stated that he was not aware of who was on the committee in 2013, and that he has never personally sat on the URC. *Id.* at 81-82.

Ms. Hagberg, a Health Services Assistant at FDC SeaTac, testified that her responsibilities included scheduling community medical appointments for inmates and filing out the paperwork for transportation requests to transport inmates to community medical appointments. Dkt. # 109 at 72-73. She explained that she only arranged medical trips for inmates in response to specific instructions from a clinician. *Id.* at 75. She further testified that she had no role in clinical decision making, was not involved in deciding when or whether Stanley should receive physical therapy or how many physical therapy sessions Stanley should have, and did not know how these decisions were made. *Id.* at 74-75.

Hagberg testified that Stanley's physical therapist was found by Seven Corners, a BOP medical contractor. *Id.* at 75. She explained that once the BOP placed a request for physical therapy with Seven Corners, Seven Corners was then responsible for finding a physical therapist and scheduling appointments with them. *See id.* 75-76.

**C. Stanley's Post-Physical Therapy Conduct**

At trial, Stanley testified that his right thumb is permanently flexed and adducted, and that he suffers from chronic cramping and numbness in his right hand. Dkt. # 109 at 29. He further testified that because of these issues, he has a difficult time completing basic daily tasks such as brushing his teeth, holding a pen or utensils, and getting dressed. *Id.* at 31-32.

However, the government presented evidence that Stanley has repeatedly engaged in activities that would seem to require a functional right hand, including softball, handball,

FINDINGS OF FACT & CONCLUSIONS OF LAW - 3

pullups, dips, and pushups. *See* Ex. 29 at 205 & Ex. 513 at 1 (handball); Ex. 30 at 39 & Ex. 500 at 1 (softball); Ex. 505 at 1 (pullups and dips); Ex. 510 at 1, Ex. 511 at 1, & Ex. 513 at 1 (pullups); Ex. 515 at 1 & Ex. 517 at 1 (pushups).

Stanley testified that he has found modifications that allow him to still engage in these activities, including doing pushups with his thumb "flexed underneath," doing pullups by just "hang[ing] . . . from a couple fingers," and "try[ing] to play [handball] just left-handed only." Dkt. # 109 at 35, 52. Stanley further testified that after his right hand was hit by a ball during the first inning of a softball game in 2013, he stopped playing. *Id.* at 35. When asked about a softball injury he sustained in 2015, where another player "slid into his left leg," *see* Ex. 500 at 1, Stanley testified that he had sustained the injury while coaching. Dkt. # 109 at 54.

**D. Stanley's Post-Physical Therapy Medical History**

The government also presented the following evidence at trial regarding Stanley's post-surgery medical history:

On October 28, 2013, Stanley underwent a health screen following his transfer to FCI Sheridan. *See* Ex. 29 at 72. No deformities, current medical conditions or other current treatments were noted. *Id.* at 73-74. Stanley was instructed on "how to obtain medical" care, but no care related to his thumb was requested or discussed. *Id.* at 74.

On March 20, 2014, following Stanley's first softball injury in which his right hand was hit by the ball while he tried to catch it, a BOP physician assistant examined Stanley's right hand and noted no "joint deformity" or "malalignment." Ex. 30 at 39.

On January 3, 2016, Stanley reported to BOP Health Services that he was unable to move his right thumb because it kept "locking." Ex. 30 at 42. The following day, he reported that he had been dealing with pain in his right hand and thumb for "the past two months," but that the pain had "dramatically worsened over [the] past couple of days." *Id.* at 45. A few days later, he reported that "at the end of softball season [he] started not being able to grip the ball as tight," and about a month prior his hand began cramping. *Id.* at 48.

On July 10, 2018, a nurse at Valley Medical Center conducted a neurological examination on Stanley and found that he had strong hand grasp in both his right and left hands.

FINDINGS OF FACT & CONCLUSIONS OF LAW - 4

Ex. 506 at 10. A doctor at Valley Medical Center subsequently cleared Stanley to return to custody and to perform work with no limitations. Ex. 507 at 1.

On November 3, 2018, Stanley reported to BOP medical staff that he fell while cleaning his shower, hurting his hand, knee and back. Ex. 508 at 1. As staff were concerned that Stanley might have reinjured his right hand, an x-ray was ordered. *Id.* at 2. The examining radiologist reported that there was "no acute fracture or joint malalignment," and that the "[o]ld healed fracture proximal shaft and metaphysis of the first metacarpal [were] in satisfactory alignment." Ex. 509 at 1.

On March 6, 2019, Stanley underwent an orthopedic examination of the long head of his right biceps tendon at Virginia Mason Health System, during which a physician assistant found that Stanley had normal sensation in all nerve distributions to his right hand, normal grip and hand strength, and movement in his fingers. Ex. 513 at 4; Dkt. # 110 at 54-55.

On December 4, 2019, a nurse examining Stanley for right arm pain and numbness through his right arm and fingers at the King County jail noted that Stanley had full range of motion in his right arm, hand, and fingers, and had equal hand grasp strength on both sides. Ex. 516 at 1.

Two days later, a physician at Harborview Medical Center examined Stanley regarding his right arm pain and found that he had full range of motion and strength in all of his fingers and normal grip in his right hand. Ex. 517 at 2. Stanley reported that he was able to use his right arm without dropping items or weakness. *Id.* at 1. Stanley was diagnosed with superficial vein thrombosis. *Id.* at 5.

On September 28, 2020, a physician assistant examined Stanley in the emergency room at CHI Franciscan, where he was being treated for multiple lacerations to the face, both forearms and hands, and his right knee. Ex. 525 at 1. The examination found that Stanley's right hand was tender but had normal sensation and normal strength, noting no deformity of the right hand. *Id.* at 4.

On March 24, 2023, a nurse practitioner examined Stanley at the King County jail and observed Stanley moving his right hand freely without deformity or contracture. Ex. 530 at 4.

FINDINGS OF FACT & CONCLUSIONS OF LAW - 5

The nurse practitioner noted that when she asked to examine Stanley's right hand, she observed him adduct his thumb to his palm and claim he could not move it. *Id.* As a result, the nurse practitioner noted high suspicion for secondary gain based on conflicting subjective and objective findings. *Id.* The nurse practitioner also noted that Stanley demonstrated the functional ability to care for himself in jail. *Id.*

### E. Testimony of Elisa Marks

Elisa Marks, an occupational therapist, testified as plaintiff's medical expert regarding the standard of care for physical or occupational therapists who provide hand therapy. Dkt. # 109 at 109.

Ms. Marks testified that after a thumb fracture, physical therapy helps a patient "regain full functional use of their opposable thumb." Dkt. # 109 at 93. She further testified that although therapy is very "individualized," "[t]he body is most receptive to the interventions we do usually in the first three months post-surgically" and that "within the six-month window following that surgery, you can still continue to make gains." Dkt. # 109 at 95. She specified that "for a Rolando fracture, in general, you would like to see the patient once the hardware is out and they're able to start mobilizing," ideally in the week or two following hardware removal. *Id.* at 99. She stated that her "goal" in therapy is "to get people to their prior level of function." *Id.* at 123.

Ms. Marks further testified that in her experience, "a complex thumb fracture takes anywhere from 10 to 16 visits" with a standard frequency of two to three times a week. *Id.* at 101. Ms. Marks stated that beginning physical therapy for Stanley in September and scheduling his second appointment three weeks after his initial appointment was "not within the standard of care in [her] eyes." *Id.* at 103, 105. She further opined that the delay in therapy and lack of therapy after October 21, 2013 likely contributed to the position and posture of plaintiff's thumb today. *Id.* at 104, 107. However, Ms. Marks also stated that she was not able to make medical diagnoses, and therefore could not formally diagnose the cause of Stanley's pain, numbness or claimed disability in his hand. *Id.* at 109. Additionally, Ms. Marks noted that her expert opinion

FINDINGS OF FACT & CONCLUSIONS OF LAW - 6

regarding Stanley's claimed disability was based primarily on Stanley's self-reports, as she had not personally examined him. *Id.* at 113-14.

### F. Testimony of Dr. Roger Blauvelt

Defendant offered the expert testimony of Dr. Roger Blauvelt, an orthopedic-trained hand surgeon. Dkt. # 110 at 28.

Dr. Blauvelt testified that after a Rolando fracture, "[n]ot every patient, not even close, needs hand therapy, but for those who do, it can be helpful or critical." *Id.* at 31. He noted that this type of fracture is unlike certain highly complex conditions, like a tendon or nerve repair that requires "a very specific level of therapy with complex splinting," for which there are established protocols. *Id.* at 41. Dr. Blauvelt concluded that "[t]he amount of physical therapy [provided] was sufficient to assist with plaintiff's healing."

Dr. Blauvelt further testified that the symptoms Stanley complains of with regard to his right hand and thumb are not expected complications or outcomes following a Rolando fracture and corresponding corrective surgery. Specifically, Dr. Blauvelt explained that following surgery, the main concern is mobility – "[i]n other words, not that the thumb assumes an extreme posture, but it doesn't get to those postures." *Id.* at 56. He testified that the expectation is that the thumb may not be able to flex, extend or abduct fully, and that a permanently adducted and flexed thumb is not an expected complication, as that outcome is "not physiologic" following a Rolando fracture and is "not what a joint problem looks like." *Id.* at 56-57. Dr. Blauvelt further explained that numbness in the palm or hand is not an expected outcome of a Rolando surgery. *Id.* at 57. Specifically, while the Rolando surgery may "generate some damage to small branches of the radial sensory nerve," the resulting outcome is a "patch of numbness on the top or edge of the thumb" which is "evident immediately" and will usually "fade." *Id.* at 57-58. Thus, numbness to the entire hand is "not a mechanical complication of a broken bone, it's just not physiologically linked." *Id.* at 58.

Dr. Blauvelt opined that, based on a review of Stanley's medical records, the functional outcome that Stanley has been able to achieve following his fracture repair is "quite good." *Id.* at 60. He further opined that he found no evidence that Stanley has any permanent injury that

FINDINGS OF FACT & CONCLUSIONS OF LAW - 7

resulted from a lack of or delay in physical therapy. *Id.* Like Ms. Marks, Dr. Blauvelt did not personally examine Stanley. *Id.* at 64.

Dr. Blauvelt also discussed the medical records stemming from Stanley's March 6, 2019 examination at Virginia Mason Health System. He testified that in his practice he treats and examines patients who have had tears to the long head of their biceps tendon and that an examination of this condition requires the provider to look at the patient's hand. *Id.* at 53. Dr. Blauvelt opined that the medical record relayed that, with regard to Stanley's right hand, "there's nothing that got [the provider's] attention. This is a normal-looking hand." *Id.* at 55. He further stated that "[i]f a person had some abnormal posturing of the hand or other unusual positioning, is that something that would be important in this kind of examination." *Id.*

## II. Defendant's Motion for Judgement on Partial Findings

At the close of Plaintiff's evidence, Defendant made an oral motion for judgment as a matter of law. Dkt. # 110 at 22.[1] In its motion, the government argued both that (1) this Court lacked jurisdiction to hear plaintiff's Federal Tort Claims Act ("FTCA") claims and (2) plaintiff had not presented evidence sufficient to meet his burden of proof on the elements of his claims. Dkt. # 110 at 22. Specifically, the government argued that plaintiff had not presented evidence of an individual at the Bureau of Prisons who has acted negligently, and thus this was a "corporate negligence" case and the United States has not waived its sovereign immunity for that claim. *Id.* Plaintiff opposed the government's motion and requested that the jurisdictional issue be resolved through written briefing. *Id.* at 25. The Court kept the government's motion

---

[1] Because this was a bench trial, not a jury trial, the Court interprets defendant's motion as one for judgment on partial findings under Rule 52(c) of the Federal Rules of Civil Procedure. *Compare* Fed. R. Civ. P. 52(c) (stating that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue") *with* Fed. R. Civ. P. 50(a) (explaining that a Court may grant a motion for judgment as a matter of law "if a party has been fully heard on an issue during a *jury* trial" (emphasis added)).

FINDINGS OF FACT & CONCLUSIONS OF LAW - 8

under consideration, and requested that the parties address the jurisdictional question in addition to the issue of liability in their written closing arguments. *Id.* at 25-26.

Without jurisdiction, this Court lacks the power to hear and decide the case. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (explaining that subject matter jurisdiction "can never be forfeited or waived" and federal courts have a continuing "independent obligation to determine whether subject-matter jurisdiction exists"); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1116 (9th Cir. 2004) (the court is obligated to consider *sua sponte* whether it has subject matter jurisdiction). A plaintiff bringing suit in federal court bears the burden of demonstrating that subject-matter jurisdiction exists. *See Ashoff v. City of Ukiah*, 130 F.3d 409, 410 (9th Cir. 1997).

Accordingly, before it can turn to the merits of plaintiff's claims, the Court must first address the jurisdictional arguments raised in the government's motion.

### A. Cognizable Claims Under the FTCA

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). Critically, "[s]overeign immunity is jurisdictional in nature. Indeed, the terms of the United States' consent to be sued in any court define that court's jurisdiction to entertain the suit." *Id.* Here, plaintiff brings suit under the FTCA, which "waived the sovereign immunity of the United States for certain torts committed by federal employees." *Id.* Specifically, the FTCA covers tort claims arising out of the conduct of a government employee acting within the scope of his or her employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . ."). In other words, a claim "comes within [the FTCA's] jurisdictional grant" and "thus is 'cognizable'" if it alleges a claim "[1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or

FINDINGS OF FACT & CONCLUSIONS OF LAW - 9

death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *F.D.I.C.*, 510 U.S. at 477 (citing 28 U.S.C. § 1346(b)).

      The Supreme Court has "consistently held that § 1346(b)'s reference to the 'law of the place' means law of the State–the source of substantive liability under the FTCA." *Id.* at 478 (quoting 28 U.S.C. § 1346(b)). Thus, because Plaintiff's injuries occurred in Washington State, the United States' liability is determined by Washington law. *See Liebsack v. United States*, 731 F.3d 850, 855 (9th Cir. 2013); *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1026 (9th Cir. 2001) (explaining that the tort liability alleged by a plaintiff must "arise from state statutory or decisional law"). The FTCA "direct[s] the courts to analogize the government to a private actor in a similar situation and apply state law to determine amenability to suit and substantive liability." *LaBarge v. Mariposa Cnty.*, 798 F.2d 364, 366 (9th Cir. 1986). "Accordingly, if [Washington] law imposes tort liability upon a private person for any of the claims alleged in [plaintiff's] complaint, the FTCA may waive the [United States'] sovereign immunity." *Jachetta v. United States*, 653 F.3d 898, 904 (9th Cir. 2011) (collecting cases).

      Stated differently, this Court only has jurisdiction over Stanley's claims if there is "decisional or statutory authority supporting claims of liability for similar conduct by private persons in [Washington]." *Meier v. United States*, No. C05-4404WHA, 2006 WL 3798160, at *3 (N.D. Cal. Dec. 22, 2006), *aff'd*, 310 Fed. App'x 976 (9th Cir. 2009). For example, in *Meier*, the court found that it did not have jurisdiction over plaintiff's FTCA claims alleging negligent hiring, training, and supervision, because the California state court opinion on which plaintiff relied found "that a hospital could be sued for failing to ensure the competence of its employees under a corporate negligence theory." *Id.* The court held that "because California law does not impose liability on a private person for a hospital's negligent hiring or supervision of medical staff, no liability can be imposed on the government on th[ose] theories." *Id.* at *4.

      **B.  Stanley's Claims**

FINDINGS OF FACT & CONCLUSIONS OF LAW - 10

The government argues that "Stanley's claims are based on the actions of the Bureau of Prisons as an entity, which is outside the waiver of sovereign immunity effected by the Federal Tort Claims Act." Dkt. # 112 at 1. Plaintiff does not dispute that "the FTCA does not waive sovereign immunity for corporate liability," but aims to come within the jurisdictional grant of the FTCA by identifying two individuals that he asserts bear responsibility for breaching the duty of care owed to him: Andrea Hagberg, Health Services Assistant, and the facility's medical directors, including Clinical Director J.C. Souza. Dkt. # 111 at 2-3. Specifically, plaintiff argues:

> Ms. Hagberg's and the medical directors' conduct violated the standard of care for rehabilitating Rolando fractures in three ways. First, Ms. Hagberg and the medical directors delayed Mr. Stanley's initial physical therapy appointment until September 10th, 2013—more than two months after Dr. Dy removed Mr. Stanley's stitches and prescribed physical therapy. Second, after Advance Physical Therapy advised BOP that Mr. Stanley should receive physical therapy one to two times a week for up to four to six weeks, Ms. Hagberg and the medical directors failed to ensure that Mr. Stanley was scheduled for follow up visits in compliance with Advance Physical Therapy's treatment plan. Instead, Ms. Hagberg and the medical directors scheduled Mr. Stanley's second physical therapy visit for October 1st, 2013, three weeks after Mr. Stanley's initial appointment; and they let another nine days pass before Mr. Stanley's next appointment, on October 10th. Finally, Ms. Hagberg did not schedule any physical therapy appointments for Mr. Stanley after his fifth and final appointment on October 21st, even though Mr. Stanley was never discharged from physical therapy and had not completed his course of care.

*Id.* at 5

However, identifying the individual government employees plaintiff claims acted negligently does not completely resolve the jurisdictional concerns. As discussed above, to bring a cognizable claim under the FTCA, Stanley must show that there is "decisional or statutory authority supporting claims of liability for similar conduct by private persons in [Washington]." *Meier*, 2006 WL 3798160, at *3; *see also United States v. Muniz*, 374 U.S. 150, 153 (1963) (explaining that "[w]hether a claim could be made out [under the FTCA] would depend upon whether a private individual under like circumstances would be liable under state law"). In his post-trial brief, plaintiff asserts two possible theories of liability: (1) medical negligence and (2)

FINDINGS OF FACT & CONCLUSIONS OF LAW - 11

ordinary negligence. *See* Dkt. # 111 at 2. The Court must determine whether a "private individual" would be liable under either theory in "like circumstances" under Washington law.

### 1. Medical Negligence

A medical negligence claim, like other negligence claims, requires a showing of duty, breach, causation, and damages. "In Washington, plaintiffs in a medical malpractice action must prove two key elements: (1) that the defendant health care provider failed to exercise the standard of care of a reasonably prudent health care provider in that same profession and (2) that such failure was a proximate cause of the plaintiff's injuries." *Frausto v. Yakima HMA, LLC*, 188 Wn. 2d 227, 231 (2017) (citing RCW 7.70.040). Expert testimony generally is required to establish the standard of care. *Id.* at 231-32 (citing *Young v. Key Pharm., Inc.*, 112 Wn. 2d 216, 228 (1989)).

Private persons may be held liable for medical negligence under Washington law. *See* RCW 7.70.020 (defining "health care provider" as, *inter alia*, a "person licensed by this state to provide health care or related services"); *see also, e.g.*, *Olson v. Siverling*, 52 Wn. App. 221 (1988) (plaintiff filed lawsuit against individual physician alleging medical negligence and failure to obtain informed consent). Accordingly, the Court finds that plaintiff's medical negligence claims are cognizable under the FTCA. Whether plaintiff has proven the elements of a medical negligence claim goes to the merits of the case rather than the jurisdictional inquiry. The Court denies defendant's motion for judgment on partial findings with regard to plaintiff's claims for medical negligence.

### 2. Ordinary Negligence

To prevail on a negligence claim, a plaintiff "'must show (1) the existence of a duty to the plaintiff, (2) a breach of that duty, (3) a resulting injury, and (4) the breach as the proximate cause of the injury.'" *N.L. v. Bethel Sch. Dist.*, 186 Wn. 2d 422, 429 (2016) (quoting *Crowe v. Gaston*, 134 Wn. 2d 509, 514 (1998)). "The premise upon which negligence rests is that an actor has a legally imposed duty, i.e., a standard of conduct to which he must adhere. That duty may spring from a legislative enactment of the standard of conduct or from a judicially imposed standard." *Amend v. Bell*, 89 Wn. 2d 124, 132 (1977).

1        Here, plaintiff argues that the relevant duty is established by the fact that "Washington courts have long recognized a jailer's special relationship with inmates, particularly the duty to ensure health, welfare, and safety." Dkt. # 111 at 6 (quoting *Picciano v. Clark Cnty.*, No. C20-6106DGE, 2022 WL 1624717, at *6 (W.D. Wash. May 23, 2022)). The Court agrees that this duty is well-recognized in state decisional law. However, plaintiff has not cited – nor can the Court find – any Washington decision extending a prison or jail's corporate liability to individual persons.

        Plaintiff directs the Court to *Gonzalez v. Dammeier Cnty. of Pierce*, 21 Wn. App. 2d 1056 (2022), however that case addressed Pierce County's appeal of the "trial court's denial of summary judgment regarding [plaintiff's] negligence claim against the County." *Gonzalez*, 21 Wn. App. 2d at *1; *see also id.* at *4 (explaining that "*Jails* owe inmates an affirmative duty to ensure their "health, welfare, and safety" (emphasis added)). Plaintiff also cites *Gregoire v. City of Oak Harbor*, 170 Wn. 2d 628 (2010), however that case dealt with "Oak Harbor, a municipality that was sued for failing to carry out its duty to provide for the health, welfare, and safety of an inmate." *Gregoire*, 170 Wn. 2d at 638.

        Other Washington cases have similarly declined to hold individual defendants liable under this theory of liability. *See Matter of Williams*, 198 Wn. 2d 342, 359 (2021) (concluding that "[p]roviding for the health of prisoners is a nondelegable duty for Washington's DOC"); *Shea v. City of Spokane*, 17 Wn. App. 236, 241 (1977) (lawsuit for negligence by jail employees brought against the city), *aff'd*, 90 Wn. 2d 43 (1978); *Winston v. State/Dep't of Corr.*, 130 Wn. App. 61 (2005) (lawsuit for negligence by prison employees brought against the state); *Baker v. State, Dep't of Corr.*, 123 Wn. App. 1038 (2004) (same); *Hopovac v. State Dep't of Corr.*, 197 Wn. App. 817 (2017) (same); *Hunt v. King Cnty.*, 4 Wn. App. 14 (1971) (suit brought against county); *Scott v. King Cnty.*, 22 Wn. App. 2d 1066 (2022) (same).[2]

---

[2] The Court recognizes that several of these cases cite to *Kusah v. McCorkle*, 100 Wn. 318 (1918). In *Kusah*, a prisoner in Thurston County jail filed a complaint against the county sheriff, alleging negligence in failing to search another prisoner who later used a weapon to attack the plaintiff. *Id.* at 319-20. The "principal question to be determined [was] whether or not the sheriff [was] answerable civiliter for alleged negligence in the performance of his duty by himself or his deepuy

FINDINGS OF FACT & CONCLUSIONS OF LAW - 13

To the extent that plaintiff attempts to convince the Court of its jurisdictional basis by citing to out-of-circuit federal court decisions on FTCA claims, these cases are irrelevant. *See* Dkt. # 111 at 7. The question here is whether Washington law imposes tort liability upon a private person for the claims alleged by plaintiff. Because none of plaintiff's cited cases interpret Washington law,[3] they cannot assist the Court in answering that question.[4]

---

[sic], in regard to the detention of the insane suspect and the manner of his custody and failure to search him upon receiving him." *Id.* at 321. While the court found that it "cannot hold as a matter of law that the sheriff is not liable for the negligence of himself and deputy," *id.* at 329, this Court does not find that *Kusah* supports plaintiff's claim here. The *Kusah* opinion focused specifically on the unique political role of the sheriff (including his relevant statutory duties) and his power in selecting and appointing his deputies. *Id.* at 321-26; *see also Pavish v. Meyers*, 129 Wn. 605 (1924) (discussing *Kusah* and noting that while sheriffs may be liable for the actions of their deputies, the logic of *Kusah* does not extend to police chiefs, who the court concludes are not liable for the actions of police officers). It is clear that *Kusah* speaks specifically to the liability of the particular role of sheriff, rather than the broader modern term of "jailer" used in the relevant cases cited above. Furthermore, a sheriff acting in his official capacity is not a "private person," thus, *Kusah* does not support a conclusion that a "a private person . . . would be liable to the claimant" under Washington law. 28 U.S.C. § 1346(b)(1).

[3] Plaintiff cites to *Dorsey v. Peter*, No. C19-113RDM, 2020 WL 881134 (M.D. Pa. Feb. 21, 2020) (applying Pennsylvania law); *Krembel v. United States*, No. C16-3018JCF, 2017 WL 1058179 (E.D.N.C. Mar. 20, 2017) (apply North Carolina law); *Knowles v. United States*, No. C12-3212JCF, 2015 WL 13214314 (E.D.N.C. Dec. 14, 2015) (applying North Carolina law); *Balter v. United States*, No. C09-1409RDM, 2014 WL 1365905 (M.D. Pa. Apr. 7, 2014) (applying Pennsylvania law). The Court also notes that none of these cases appear to substantively address the question of whether a private person would be liable under the relevant state law.

[4] Plaintiff also points out that the Supreme Court has stated that "the duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. § 4042, independent of an inconsistent state rule." *Muniz*, 374 U.S. at 164-65. This statement was made in a Supreme Court case reasoning that "a person can sue under the Federal Tort Claims Act to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee." *Id.* at 150. In making this ruling, the Court noted that "[j]ailers in some States are not liable to their prisoners" due to state law grants of immunity and concluded that it would be "improper to limit suits by federal prisoners because of restrictive state rules of immunity," noting that 18 U.S.C. § 4042 imposes a duty on the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." *Id.* at 164-65. However, in that same opinion the Court cautioned that "[w]hether a claim could be made out would depend upon whether a private individual under like circumstances would be liable under state law, but prisoners are at least not prohibited from suing [under the FTCA]." *Id.* at 153. Here, the Court agrees that jailers under both Washington law and federal statute owe a duty of care to their inmates. However,

FINDINGS OF FACT & CONCLUSIONS OF LAW - 14

As neither plaintiff nor the Court has identified any Washington decisional or statutory law that imposes liability on a private person for breaching the duty of care owed by jails to their inmates, the Court concludes that it lacks jurisdiction over plaintiff's ordinary negligence claims and grants in part defendant's Rule 52(c) motion.

The Court now turns to plaintiff's claims that it has determined it has jurisdiction to hear – specifically, plaintiff's medical negligence claims against Ms. Hagberg and FDC Seatac's medical directors.

### III.  Findings of Fact & Conclusions of Law

The Court has considered the evidence presented at trial, the exhibits admitted into evidence, and the arguments of counsel. Being fully advised, the Court now makes the following findings of fact and conclusions of law:

### A.  Initial Appointment

Plaintiff argues that Ms. Hagberg and the FDC SeaTac medical directors – specifically, Dr. Souza – breached their duty of care by failing to schedule plaintiff's initial physical therapy appointment until September 10, 2013 – more than two months after plaintiff's stitches were removed and physical therapy was first recommended.

As an initial matter, the Court finds that plaintiff has failed to establish that Ms. Hagberg was involved in determining the timing of Stanley's initial physical therapy appointment. Accordingly, it concludes that no claim of negligence for the asserted delay in beginning physical therapy can lie against Ms. Hagberg.

As to the other individual BOP employee identified by plaintiff – Dr. Souza – the Court finds that plaintiff has failed to put forward evidence establishing the appropriate standard of

---

under Washington law, private individuals are not liable for a breach of that duty, a fact that is fatal to plaintiff's general negligence claim under the FTCA.

The Court also notes that the continuing vitality of the application of a standard of care set by federal statute in FTCA cases is called into question by more recent Supreme Court decisions, which emphasize that where "federal law, not state law, provides the source of liability for a claim" that claim is "not cognizable" under the FTCA. *F.D.I.C.*, 510 U.S. at 477-78.

FINDINGS OF FACT & CONCLUSIONS OF LAW - 15

care for a physician prescribing physical therapy after Rolando fracture surgery. Under Washington law, "'expert testimony will generally be necessary to establish the standard of care.'" *Young v. Key Pharm., Inc.*, 112 Wn. 2d 216, 228 (1989) (quoting *Harris v. Groth*, 99 Wn. 2d 438, 449 (1983)). The expert must have "sufficient expertise in the relevant specialty" such that the expert is familiar with the procedure or medical problem at issue. *Id.* at 229. Critically, "only physicians may testify as to another physician's standard of care." *Frausto*, 188 Wn. 2d at 229 n.1. Here, plaintiff offered expert testimony from an occupational therapist – he did not put forward any evidence demonstrating the standard of care for a physician ordering physical therapy for a patient post-surgery. Accordingly, plaintiff cannot establish Dr. Souza's liability for medical negligence under Washington Law. *See Colwell v. Holy Fam. Hosp.*, 104 Wn. App. 606 (2001) ("If the plaintiff in a medical negligence suit lacks competent expert testimony, the defendant is entitled to summary judgment."), *abrogated on other grounds by Frausto*, 188 Wn. 2d 227.

### B. Course of Treatment

Plaintiff next argues that "after Advance Physical Therapy advised BOP that Mr. Stanley should receive physical therapy one to two times a week for up to four to six weeks, Ms. Hagberg and the medical directors failed to ensure that Mr. Stanley was scheduled for follow up visits in compliance with Advance Physical Therapy's treatment plan." Dkt. # 111 at 5.

The Court finds by a preponderance of the evidence that the responsibility for scheduling Stanley's physical therapy appointments laid with Seven Corners, the BOP contractor. Ms. Hagberg clearly testified that responsibility for finding Stanley a physical therapist and scheduling his physical therapy sessions was outsourced to a contractor called Seven Corners. The only evidence plaintiff offers to contradict this testimony are the patient notes from Advance Physical Therapy, which reflect that in August of 2013 a "lady from the Federal Detention Center" called to reschedule plaintiff's first physical therapy appointment, and that on the date of plaintiff's first physical therapy appointment, the "Federal Deten[t]ion Center called to ask for a list of exercises for him to do in between his visits" noting that "they do not want to set up a set [schedule] of twice a week [appointments] due to the cost of the [appointment] plus

FINDINGS OF FACT & CONCLUSIONS OF LAW - 16

transport[ations] and the services of two marshals." Ex. 16 at 23.[5] However, the notes also reflect a notation on September 18, 2023 – prior to Stanley's second physical therapy appointment – that a representative from Seven Corners was the "point of contact for appointments and questions." *Id.* Given that no one testified as to the meaning of these notes at trial, and that all the notes making reference to FDC SeaTac were dated either the day of or prior to Stanley's first physical therapist appointment, the Court finds that plaintiff has failed to demonstrate by a preponderance of the evidence that Ms. Hagberg, or any individual at FDC SeaTac, was responsible for scheduling follow up visits in compliance with Advance Physical Therapy's treatment plan.[6]

### C. Follow Up Appointments

Finally, plaintiff argues that "Ms. Hagberg did not schedule any physical therapy appointments for Stanley after his fifth and final appointment on October 21st, even though Stanley was never discharged from physical therapy and had not completed his course of care." Dkt. # 111 at 5. However, Stanley was transferred from FCI SeaTac, where Ms. Hagberg was employed, to FCI Sheridan the week following his final physical therapy appointment. *See* Dkt. # 109 at 38; Ex. 29 at 72. The Court finds Stanley's BOP medical records were electronically stored and accessible by treatment providers at Sheridan. *Id.* at 75. It further finds that plaintiff has failed to demonstrate that Ms. Hagberg had any responsibility for scheduling medical appointments for Stanley after he was transferred from FDC SeaTac. Accordingly, the Court concludes that no claim of negligence for the failure to schedule additional physical therapy appointments can lie against Ms. Hagberg.

---

[5] The Court notes that, even taking this statement at face value, it does not support a finding of negligence on the part of a BOP employee, as Advance Physical Therapy recommended a frequency of either one or two times per week (and plaintiff's expert testified that Advance Physical Therapy met the standard of care, *see* Dkt. # 109 at 126). Thus, to the extent that a BOP employee was indicating that the once-a-week frequency was preferred, plaintiff has failed to argue or show that such a scheduling request would fall below the standard of care.

[6] The Court further notes that the waiver of sovereign immunity in the FTCA is limited to acts of government employees and does not extend to acts of independent contractors. *See Logue v. United States*, 412 U.S. 521, 526-30 (1973).

FINDINGS OF FACT & CONCLUSIONS OF LAW - 17

### D. Causation

Finally, the Court additionally finds that even if Stanley were able to establish duty and breach, he has failed to demonstrate causation.

In Washington, expert testimony on medical causation must be expressed in terms of "reasonable medical certainty or reasonable medical probability." *Desranleau v. Hyland's, Inc.*, 26 Wn. App. 2d 418, 438 (2023) (quoting *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn. 2d 593, 606-07 (2011)). Such testimony must go beyond a mere possibility to meet the standard of reasonable medical certainty. *Desranleau*, 26 Wn. App. 2d at 438. "The testimony must be sufficient to establish that the injury-producing situation 'probably' or 'more likely than not' caused the subsequent condition, rather than that the accident or injury 'might have,' 'could have,' or 'possibly did' cause the subsequent condition." *Rounds v. Nellcor Puritan Bennett, Inc.*, 147 Wn. App. 155, 163 (2008) (quoting *Merriman v. Toothaker*, 9 Wn. App. 810, 814 (1973)).

While plaintiff provided the testimony of a qualified occupational therapist who opined that the failure to provide Stanley with a prompt, frequent, and complete course of physical therapy "more likely than not" contributed to plaintiff's claimed symptoms, Ms. Marks's testimony was based primarily on plaintiff's self-reports. Having heard all the evidence and having the opportunity to make credibility determinations, the Court finds that plaintiff has failed to meet his burden of demonstrating by a preponderance of the evidence that his allegedly deficient course of physical therapy proximately caused his claimed symptoms and disability. In reaching this conclusion, the Court weighed the testimony of Ms. Marks and plaintiff's own testimony against the voluminous evidence of plaintiff engaging in activities that require a functional right hand, medical records indicating that medical providers found no deformity and normal grip strength in plaintiff's right hand, the expert testimony of Dr. Blauvelt opining that plaintiff's claimed symptoms and disability are not physiologically related to his Rolando fracture surgery, and the Court's own observations of the witnesses at trial.

### IV. Conclusion

FINDINGS OF FACT & CONCLUSIONS OF LAW - 18

For all of the foregoing reasons, and based on the findings recited above and the Court's conclusions of law, the Court finds in favor of defendant on all of plaintiff's claims. The Clerk of Court is directed to enter judgment in favor of defendant and against plaintiff.

IT IS SO ORDERED.

DATED this 4th day of October, 2023.

*Robert S. Lasnik* (signature)
Robert S. Lasnik
United States District Judge